J-A16004-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JAMAL CHARLES | : | |
| Appellant | : | No. 1931 EDA 2024 |

Appeal from the Judgment of Sentence Entered June 25, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005102-2023

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY LAZARUS, P.J.:             **FILED SEPTEMBER 12, 2025**

Jamal Charles appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following a stipulated waiver trial after which the trial court convicted him of criminal conspiracy,[1] possession with intent to deliver (PWID),[2] simple possession,[3] and multiple firearm offenses.[4]  After careful review, we affirm.

The trial court succinctly stated the facts surrounding Charles' arrest as follows:

---

[1] 18 Pa.C.S.A. § 903.

[2] 35 P.S. § 780-113(a)(30).

[3] *Id.* at § 780-113(a)(16).

[4] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), & 6108.

On the evening of June 14, 2023[,] just after 7 p.m., Philadelphia Police Officer Thomas Lacorte (Officer Lacorte) of the Narcotics Enforcement Team was surveilling the area of 137 West Chelten Avenue for illegal narcotics sales after numerous complaints. N[.]T[., Suppression Hearing, 2/7/24], [at] 6, 22. Officer Lacorte observed Jamal Charles [] and another male, later identified as Jenkins. *Id.*[,] at [] 7, 23. Shortly thereafter, Officer Lacorte observed a Hispanic male[, Perez,] approach [Charles] and [Robert] Jenkins and, after a brief discussion, Jenkins and the male walked to the side of the building. *Id.* at 9. Once there, Jenkins reached into a black plastic bag that he was carrying and took out a light blue packet containing alleged marijuana and handed it to the male in exchange for an unknown amount of U.S. [c]urrency. *Id.* at 9, 10. The male then left the scene. *Id.* at 9. While this sale was going on, [Charles] remained standing in front of the store, "looking in all directions up and down the street." *Id.* A few minutes [later], Jenkins and [Charles] were approached by a Black male[, Fullwood,] and engaged in brief conversation. *Id.* at 11. Jenkins and this second male walked around to the side of the building where Jenkins again reached into the black plastic bag and retrieved a light blue packet containing alleged marijuana and handed it to the male. *Id.* Once again, during this exchange, [Charles] remained in position on the sidewalk and kept looking up and down West Chelten Avenue in all directions and back to where Jenkins and the male were conducting their exchange. *Id.* The male then left the scene. *Id.* At approximately 7:17 p.m., [Charles] and Jenkins began walking westbound on West Chelten Avenue and, based on his experience, Officer Lacorte believed they were leaving the area after completing their transactions. *Id.* at 12. Officer Lacorte alerted backup officers to stop the two men. *Id.* Jenkins threw the black plastic bag over a wall. *Id.*[,] at 13. Backup officers stopped the two men and recovered the bag, which was found to contain seven packets of marijuana matching those recovered from the two buyers, and Jenkins and [Charles] were both placed under arrest. *Id.* at 13-15. A firearm was recovered from [Charles'] person in a search incident to arrest. *Id.* at 13.

[Charles] was charged with multiple drug and firearm offenses, including possession with intent to deliver, conspiracy, and carrying firearms without a license.

Trial Court Opinion, 11/12/24, at 1-2.

On August 10, 2023, Charles filed an omnibus pretrial motion seeking to suppress the firearm recovered from his person where his arrest was illegal because it was unsupported by probable cause. On February 7, 2024, the trial court denied Charles' suppression motion and, on the same day, found him guilty of all offenses. On June 25, 2024, the court sentenced Charles to an aggregate term of two to four years' confinement, followed by five years of probation. Charles filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[5] Charles presents the following issues for our review:

> (1) Did [the] police have probable cause to arrest [] Charles for drug offenses based on his looking at a busy street near another person who was selling drugs?
>
> (2) Was the evidence insufficient to establish a conspiracy where there was no evidence that [] Charles agreed to help his co-conspirator sell drugs?
>
> (3) Was the evidence insufficient to support [] Charles' drug-related convictions where he neither possessed nor delivered any controlled substances?

Appellant's Brief, at 2.

_____

[5] Charles filed a motion for extension to file his Rule 1925(b) statement because he had not yet received transcripts necessary to compose the statement. Even though the trial court did not rule on the extension motion, because Charles attached the transcript purchase orders to the motion and filed his extension request at least five days before the statement's due date, the motion is deemed to have been granted. **See** Pa.R.A.P. 1925(b)(2)(ii).

First, Charles contests the trial court's denial of his motion to suppress the firearm seized on his person, claiming that the police lacked probable cause to arrest him. It is well-settled that:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. . . . [W]e must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Those properly supported facts are binding upon us and we may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (citations and quotation marks omitted).

To determine whether probable cause exists, a totality of the circumstances test is applied. *Id.* (citation omitted). Probable cause is established when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Id.* (citation omitted). In deciding whether officers had probable cause to arrest a defendant whom they believed participated in a drug transaction, "[t]he time is important; the street location is important; the use of a street for commercial transactions is important; the number of such transactions is important; the place where the small items were kept by one of the sellers is important; the movements and manners of the parties are important."

- 4 -

*Commonwealth v. Lawson*, 309 A.2d 391, 394 (Pa. 1973). Additionally, probable cause exists "when criminality is one reasonable inference; it need not be the only, or even the most likely, inference." *Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. 1996). *See Commonwealth v. Stroud*, 699 A.2d 1305, 1308 (Pa. Super. 1997) ("[P]robable cause does not deal with certainties[.]").

In *Thompson*, *supra*, our Supreme Court found that a police officer had probable cause to stop and search the defendant because "a police officer's experience may fairly be regarded as a relevant factor in determining probable cause [where there is] *a nexus between his experience and the search, arrest, or seizure of evidence*." *Id.* at 935 (citing *Dunlap*, 941 A.2d at 676, 679)). In *Commonwealth v. Banks*, 658 A.2d 752 (Pa. 1995), the Supreme Court recognized additional factors which could give rise to probable cause such as: (1) a trained narcotics officer observing the exchange of either drugs or containers commonly known to hold drugs; (2) the police observing multiple, complex, suspicious transactions; or (3) a police officer responding to a citizen's complaint or to an informant's tip. *Id.* at 753. *See also Commonwealth v. Melendez*, 251 A.3d 1247 (Pa. Super. 2021) (Table)[6] (concluding officer had probable cause based on defendant continually

---

[6] *See* Pa.R.A.P. 126(b) (unpublished non-precedential decisions of this Court issued after May 1, 2019, may be cited for their persuasive value).

glancing at officer in back seat, at surroundings, and into side rear-view mirror; conduct consistent with someone keeping lookout for police or other sources of trouble).

Here, the evidence supports the conclusion that Officer Lacorte had probable cause to arrest Charles and conduct a search incident to his arrest.[7] Charles' argument that he was arrested only because "he had the misfortune to gaze up and down a busy commercial street while an acquaintance sold marijuana at a building on the same block," Appellant's Brief, at 11, is unpersuasive. Officer Lacorte reasonably inferred that Charles was a lookout for Jenkins based on the recognizable pattern of criminal behavior between a drug dealer and his cohort. Specifically, Officer Lacorte was conducting surveillance at 137 West Chelton Avenue when he observed Jenkins and Charles "hanging outside [a] store" that had "numerous complaints of illicit narcotic sales [taking] place inside and outside of [it]." N.T. Suppression Hearing, 2/7/24, at 6. Officer Lacorte first watched as Charles and Jenkins were approached by a Hispanic male (Perez), observed all three males have a "brief conversation . . . standing together," and then watched Jenkins and Perez walk to the side of the building where the alleged drug transaction

_____

[7] "The search incident to arrest exception allows arresting officers, in order to prevent the arrestee from obtaining a weapon or destroying evidence, to search both the person arrested and the area within his immediate control." *Commonwealth v. Simonson*, 148 A.3d 792, 799 (Pa. Super. 2016) (some punctuation omitted).

occurred, while Charles "was standing outside looking in all directions up and down the street." *Id.* at 7, 9; *Melendez*, *supra*. *See also* Trial Court Opinion, 11/12/24, at 4 ("Then after the individual [left], [Charles'] disposition would become relaxed again, and he and Jenkins would resume their conversation until another individual approached them[,] and the process would repeat."). After Perez handed Jenkins an unknown amount of currency, Jenkins reached inside of a black plastic bag, that was on his person, and took out a light blue packet that he handed to Perez. *See* N.T. Suppression Hearing, 2/7/24, at 9.

Five minutes after Perez left the scene, Jenkins and Charles were approached by another individual, Fullwood. *Id.* at 11. Again, the three individuals had a "brief conversation" after which Jenkins and Fullwood walked to the side of the building while "Charles kept looking up and down Chelton Avenue in all directions and then looked back to where Jenkins was[.]" *Id.* Jenkins reached into the same black plastic bag, pulled out another packet, and handed it to Fullwood. *Id.* After Fullwood left in his vehicle, Jenkins and Charles "started walking westbound on Chelton Avenue" and were stopped by Officers Williams and Rodriguez. *Id.* at 13.

Officer Lacorte testified that he believed Jenkins and Charles left the area after less than ten minutes based on the past 20 times he had surveilled the area and watched "all the defendants make [one] or [two] sales, and the[n] leave the area[.] " *Id.* at 12. Officer Lacorte also testified that during

his 25 years on the Narcotics Enforcement Team, he had done "thousands" of surveillance jobs, including about 20 "positive jobs" for narcotics surveillances in the last two years in the area of the incident. *Id.* at 8-9. Officer Lacorte testified that, based on his experience, Charles' behavior, his interaction with the suspected buyers and Jenkins, and the way that Charles' "head [was] on the swivel looking in all directions" during the two transactions, he believed Charles' actions were consistent with those of a lookout for a narcotics transaction. *Id.* at 17-18.

Accordingly, we conclude that, based upon Officer Lacorte's detailed testimony at the suppression hearing, the Commonwealth established a nexus between the officer's training and experience and his subsequent search and seizure of Charles. *See Thompson*, *supra* at 936 (nexus between officer's experience and observations he made established where nine-year veteran officer "was personally familiar with heroin sales activity in the neighborhood, heroin packaging, and hand-to-hand drug exchanges on the street"). Officer Lacorte's experience with drug transactions in the exact area where Charles was arrested led him to believe he had witnessed Charles act as a lookout for two drug sales. Having established the required nexus, we conclude that Officer Lacorte had probable cause to arrest Charles.

Next, Charles challenges the sufficiency of the evidence supporting his conspiracy conviction. He argues that there is neither evidence of an

agreement between Charles and Jenkins nor evidence of his involvement in a drug-dealing conspiracy.

Our standard of review of a challenge to the sufficiency of the evidence is well-established:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. . . . The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa. Super. 2006) (citations and quotation marks omitted). "To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons[,] (2) with a shared criminal intent[,] and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Rios*, 684 A.2d 1025, 1030 (Pa. 1996); *see also* 18 Pa.C.S.A. § 903. However, because an explicit or formal agreement to commit a criminal act is rarely proven, such an agreement can be inferred from circumstantial evidence such as "the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators[.]" *McCall*, 911 A.2d at 997. *See Commonwealth v. Ruiz*,

819 A.2d 92, 97 (Pa. Super. 2003) (citation omitted) ("Among the circumstances [that] are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy.").

Nevertheless, a defendant's "[m]ere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient" to demonstrate involvement in a criminal conspiracy. *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (en banc) (citation omitted). While the defendant need not commit the overt act because a co-conspirator may do so, he or she must be an active participant in the criminal enterprise rather than a "passive bystander." *Id.*; *McCall*, 911 A.2d at 997. In *Melendez*, *supra*, this court found sufficient evidence to uphold a defendant's conspiracy conviction where he sat next to the suspected drug dealer, continually looked around, and police recovered packets of drugs and a gun from his person. *Id.* at 1247. *See also McCall*, 911 A.2d at 997 (conviction for criminal conspiracy of PWID affirmed on appeal where defendant took "active role in the illicit enterprise" by acting as lookout and receiving money from his cohort, although he never possessed or sold drugs).

Here, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence is sufficient to establish that Charles was involved in a conspiracy where he entered into an agreement

with Jenkins to commit an unlawful act. Although mere presence at the scene of the crime is insufficient to prove conspiracy, the evidence shows that Charles conversed with Jenkins prior to both drug buys, then talked with Jenkins and the two buyers, looked up and down the street while the transactions occurred, and, finally, left the area with Jenkins after the two transactions were completed—facts supporting an association between the alleged co-conspirators. *See* N.T. Suppression Hearing, 2/7/2024, at 7-17. Officer Lacorte also stated that Charles and Jenkins were standing inches apart when he observed them. *Id.* at 15. While Jenkins engaged in the drug transactions with third parties at the side of the building, Charles "kept looking up and down Chelten Avenue in all directions and then looked back to where Jenkins was[.]" *Id.* at 11. Based on Charles' active role as a lookout, an agreement between Charles and Jenkins can sufficiently be inferred to establish a conspiracy. *See* 18 Pa.C.S.A. § 903

Finally, Charles challenges the sufficiency of the evidence for his drug possession charges, arguing that the convictions should be reversed because he did not possess any drugs.[8] Instantly, the trial court convicted Charles of drug possession based on conspiratorial liability, not actual possession.

---

[8] To establish PWID, the Commonwealth must prove that the defendant "manufacture[d], deliver[ed], or possess[ed] with intent to manufacture or deliver, a controlled substance[.]" 35 P.S. §§ 780-113(a)(30). Similarly, to prove that someone knowingly and intentionally possessed drugs, the Commonwealth must show that the defendant "knowingly or intentionally possess[ed] a controlled or counterfeit substance[.]" *Id.* §§ 780-113(a)(16).

Despite conceding that there is binding Pennsylvania Supreme Court[9] precedent supporting co-conspirator liability, Charles contends the common-law rule is "untenable in light of the plain language of the Crimes Code" and should be overturned.  Appellant's Brief, at 27.  **See also** Appellant's Brief, at 25 ("In fairness to the lower court, there is binding Supreme Court precedent supporting this line of reasoning.").

Conspiratorial liability is "routinely [] utilized" to convict one person for the acts of another.  **Commonwealth v. Chambers**, 188 A.3d 400, 408 (Pa. 2018).  "All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action."  **Lambert**, 795 A.2d at 1017 (citation omitted).  **See Commonwealth v. Smith**, 985 A.2d 886, 896–97 (Pa. 2009) (finding evidence sufficient to convict defendant of first-degree murder as co-conspirator despite not being one to fire fatal bullet).  In **McCall**, **supra**, the court found sufficient evidence to convict the defendant of PWID based on conspiratorial liability for his active role as a lookout, despite not actually handling the drugs or collecting money directly from the buyers.  **Id.** at 997.

Having found that there is sufficient evidence to prove a conspiracy, **see supra** at 11, we conclude that Charles is criminally liable for the actions of his

_____

[9] We note that our Court is bound by existing Supreme Court precedent.  **See Commonwealth v. Martin**, 205 A.3d 1247, 1252 (Pa. Super. 2019) (Superior Court bound by existing precedent under doctrine of *stare decisis* and follows controlling precedent).

co-conspirator, Jenkins. Similar to the defendant in **McCall**, **supra**, Charles acted as Jenkins' lookout in two narcotics transactions without handling any drugs or money like his cohort, Jenkins. **Id.** at 997. Thus, because the evidence was sufficient to convict Charles for conspiracy, the evidence was sufficient to convict Charles, as a co-conspirator, for PWID and simple possession.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2025